The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning. First case today is People v. Petersen. That's case number 4-2-3-0-2-8-0. Would counsel for the appellate please identify yourself for the record? Good morning, your honors. My name is Elena Penick, appearing for Amanda Petersen. And counsel for the appellate? Allison Page Brooks on behalf of the people. Thank you. Ms. Penick, are you ready to proceed? Yes, your honor. Please do so. Again, good morning, your honors and counsel. My name is Elena Penick, appearing on behalf of defendant appellant Amanda Petersen. I'd like to address the trial court's error in allowing the state to present evidence of Amanda's sexual orientation in a jury trial for child sex abuse, and then briefly address the improper double enhancement that contributed to Amanda's severe sentence. People v. Stowe made clear that evidence of an adult defendant's sexual orientation has no place in a prosecution for sexual abuse of a minor. Instead, the modern understanding of pedophilia is that it exists wholly independently from homosexuality. No longer are courts willing to indulge the belief that homosexuals are more likely to be attracted to children or that a correlation exists between a child molester's sexual orientation and his or her Stowe established that any would be case. Excuse me for interrupting. Sure. Discussion of Stowe, but let's assume for just a minute that indeed, the trial court did air, getting really to the heart of an important issue here. Why was this not harmless, harmless error? Because in this case, the mention of it was really de minimis. It wasn't argued as it was in other cases. There was a limiting instruction given by the trial court. This was very different than the mention and use in other cases. So why was it not harmless error here? Well, first of all, you know, your honor mentions the de minimis nature of the evidence. And of course, we recognize this is just a few seconds of a video. But it doesn't take long for the baggage that people bring to the subject of sexuality to come flooding in. So if you imagine a teenage boy coming out to his parents, you know, mom, dad, I'm gay. Sure, this is a brief statement, but that brevity is really not proportionate to the impact that it has. And in this particular case, the statement Amanda makes is not muffled or buried in the interrogation video. It's actually, you know, the detective asks what her sexual orientation is. She indicates she's bisexual. And then the screen goes black for a moment, presumably from some redaction. And it sort of gives dramatic impact to what was just said. So the way it came out, it seems short, but it's certainly enough to have made an impression on the jury. And it's important to recognize here, too, that although there was an instruction that, you know, bias isn't supposed to affect the jury's verdict, whether on the nature of sexual orientation or gender, the state's whole purpose of it was to allow the jury to infer that the fact that she was bisexual made it more likely that she would have committed this offense. It's not necessarily a propensity argument, but it's like they're claiming to rebut these traditional societal expectations. And so, you know, the if the challenged evidence were so meaningless, then why would the state have fought to keep it in? Well, in your answer, there's just one other follow-up question I'd like to ask. It seemed to me you and I have not read the voir dire part of the record here, but you alluded to the fact that there are jurors who were biased or would have or you assume that jurors would have a bias against homosexuality or bisexuality. I mean, is that what the record shows? Was there not questioning? I mean, the attorneys obviously knew the nature of this case or the charges here. I would have thought that there would have been questions with respect to gender and bias and sexual orientation that would have been asked during voir dire and that certainly those kept on the jury would have indicated that that would not have influenced their decisions. Can you enlighten us on that, please? Yeah, our position is not that the jurors certainly had bias against Amanda based on her sexual orientation. There was a discussion in voir dire about that Illinois pattern instruction 1.01b that talks about that, you know, jurors are to avoid implicit bias on these subjects. The point is more that the state wanted to use this for the purpose of making it more likely that Amanda committed this offense. That's why they're using it. And so it's not feasible to say that it can have no impact just because we don't know what the jury was thinking. The state was hoping they would be using it. And it's also important too that the evidence in this case was truly closely balanced in that sense in line with Stowe. In that sense, anything that threatened to unfairly tip the scales against her can't be discounted. We've got a she said, she said trial that pitted the story of a child with admittedly severe mental health issues, most notably delusions and hallucinations against the words of her stepmother. And so there's no physical evidence to corroborate what kind of touches did or didn't happen. And we know the jury wasn't buying all that the state was selling because it acquitted on three counts. So in this sense, it certainly was not harmless in this case. Thank you. So while you pause there, you've indicated this was really important for the state, the state did not even mention it in closing argument. Did it? That's correct. Okay. But again, given the closeness of the evidence and the fact that the state wanted this evidence in for this purpose, they, it, they can't at this point say it has no impact on the jury. They know it has an impact on the jury. That's why they want to use. Well, counsel, I think we're past that. I think the discussion now is whether or not it was harmless, you know, why the state persisted to try to bring this in is not really relevant. I, I think it's almost more of a weighing the evidence to convict versus acquit. Yeah. Well, I mean, in that sense, I, again, I don't think there can be much dispute that evidence was close here. I mean, the position of the defense was not that it's unclear what the intent was behind the touches. It was whether or not these touches happened at all. You know, and it, it's not that a child with mental health issues can never be believed, but in a case where it hinges so much on her testimony, and we know for a fact that she did have these severe delusions, it's entirely possible that she wasn't, you know, that she was essentially imagining these occurrences. And we, if we have tangible evidence of some discrepancy between what she says happened and what we know happened, because, you know, she's saying she smoked marijuana and yet her toxicology screen was negative for cannabis. So where do we perception? Certainly that was a difficult question for the jury to resolve and anything that threatened to unfairly shade the case in the state's favor would be impactful in this situation. If your honors don't have any further questions, I can move on to the second issue briefly. Please do so. Thank you. So in the event, this court does not remand for a new trial, sentencing relief is warranted. When the trial court sentenced Amanda to the maximum extended prison term, it expressly relied on a statutory aggravating factor based on Amanda holding a position of trust relative to the victim in this case. And yet the same position of trust factor appeared in the issues instructions to the jury as an element of the offense, which was part and parcel of what made this a class two felony in the first place. And so the trial court subjected Amanda to an improper double enhancement. Now it's true the relevant section of the code of corrections mentions aggravated criminal sexual abuse as an offense to which the aggravating factor may be applied. However, at the time that language was added to the code of corrections, the offense statute was not defined in such a way as to include sexual conduct committed by someone who held a position of trust relative to the victim. And so because there was no potential for overlap, the legislature had no reason to carve out an exception for aggravated criminal sexual abuse cases premised on holding a position of trust. Um, nor can it be said that the legislature's adding that trust language to the offense statute thereafter demonstrated the kind of clear intention to override the prohibition on double enhancement that is needed to apply that kind of provision twice. There's about a dozen different ways to commit the offense of aggravated criminal sexual abuse, and nearly three dozen aggravating factors listed in section 553.2. Um, and so at best we can say it looks like maybe the legislature was trying to create this like buffet of mix and match elements that can be combined to capture any given case. But you can't say from that, that vast selection that the legislature clearly intended to allow double dipping with regard to the same factor. Um, and the double enhancement error was, was, uh, prejudicial because this was a closely balanced sentencing hearing. Yes, Amanda had a long criminal history. However, it was mitigated by its nonviolent character, her own history of personal trauma, and frankly, an impressive commitment to sobriety and self improvement while she was waiting for trial. And yet we've got someone receiving the maximum extended term available, which would seem better suited to someone with no, no rehabilitative potential. Um, and so for all these reasons, Amanda asks this court to, if it does not remand for a new trial to either reduce her sentence or vacated and remand for resentencing. Thank you. Okay, thank you. You will have rebuttals. I believe Justice Zinoff has a question. I'm sorry, I was muted. Um, I do have one question. The legislature not intended to include, um, the offense section we're involved with in this case in the code of corrections, uh, and in the factors that we've talked about the position of trust and authority. It certainly could have amended that section in the code of corrections when it did enact the section that you refer to 11.60. Could it not? It could have, yes, but you know, I think, go ahead. It didn't do it. Um, it, it didn't do it to change the dynamic as far as this issue is concerned. Um, I think what's important to note here is it's not when we're talking about overriding this, um, general statutory prohibition on double enhancement, it's not enough to say that it was, you know, the legislature arguably intended to permit it. We need, in fact, clear evidence that the legislature wanted double enhancement here. And an example of that came up in the Illinois Supreme Court's Phelps decision. They're citing, um, the Whitney case. For example, section 584 requires consecutive sentencing, um, if someone is convicted of a class one or class X and the defendant inflicted severe bodily injury. In that situation, even if we're dealing with an offense that involves severe bodily injury, the legislature clearly intended to, um, require consecutive sentencing because it's like a very narrowly tailored provision. Um, it wouldn't make much if you didn't apply it. But here, when there's this array of factors in either direction, both defining the offense and defining the aggravating factors, that kind of intentionality is not at all clear. Um, it's, it's certainly easy to overlook for a legislature to overlook how these interplay at times. Um, so no, it's not an amendment of the sort you described, but we would still submit that, um, that was not intended. Well, how would we as an appellate court discern if the legislature made a mistake and overlooked this? I mean, don't we have to presume that the legislature knew what it was doing and specifically kept it in, didn't make the, the change? I think when we're talking about double enhancement, you know, we don't give the benefit of the doubt to the legislature that they knew what they were doing. We require that kind of clarity. And in the absence of that clarity, the rule of lenity dictates that we have to give the benefit of the doubt to the defendant. Um, so in this situation, um, we would submit she was subjected to an improper double enhancement and that contributed to her receiving the maximum extended sentence here. Thank you. Thank you, your honors. Thank you, Ms. Brooks. Thank you, your honors. May I please the court and counsel, um, with issue of respect to whether the trial court abused its discretion, weighing the probative value and prejudicial effect of the, uh, of the, the small, like three second question and answer part of the interview where the defendant admitted that she was bisexual. Um, the defendant relies on a Stowe case. However, the state urges this court not to follow Stowe, um, for multiple reasons. Um, the first primarily is that Stowe is not persuasively analyzed by relying on the out-of-state cases like Garcia and Kratz attempts to create a broad rule that whenever the victim is say, like under 18, that the defendant's sexual orientation is irrelevant. However, the cases of Garcia, which involved, I think, a six-year-old girl, a case of clear pedophilia, uh, or Kratz as well, these are cases where they rely on, where they, they create a rule that says that, that when they defendant is abusing very young victims and the case is a matter of pedophilia, that that is a situation where the defendant's sexual orientation doesn't really bear on the defendant's, uh, the offender's selection of victims, that the victim's gender doesn't really bear if it's a case of pedophilia. However, Stowe, like this case was, um, the present case here was victims were 14, which is not a case of pedophilia because pedophilia deals with prepubescent victims and the victim here was at least pubescent. Um, so therefore the, the logic of the rule drawn from the Garcia and Kratz cases does not apply when it's a rule based on whether a defendant who is a pedophile selects very young victims of either gender, regardless of their own sexual orientation, doesn't apply when the defendant has the sexual orientation and is selecting, uh, children who are not prepubescent, um, so older than that. So that's why the, the, the rule can be adopted by this court because it just doesn't follow from the Garcia and Kratz cases that Stowe relied upon. And also it's factually distinguishable. The other reason is, is that Stowe relies on other conduct evidence, which is the possession of, I think it was photographs of adult adult nude males or something, um, which is other conduct evidence, other bad acts. And, and that's a whole different issue here as to whether a defendant who simply admits to being bisexual is not a matter of conduct or bad acts is simply, that's just what she says her sexual orientation is. And the, the difference here also is the fact there is a limiting instruction dealing with implicit violence matters of sexual orientation. The jury received multiple times and also there's no use in closing argument, which one of the major parts of Stowe was the, the sort of improper closing argument aspect where the possession of the photographs was, was drawn into some sort of propensity to commit sexual abuse against minors was in Stowe. That sort of like improper argument is not here. So for all those reasons, Stowe is also distinguishable. So I did not want to, by urging that the error, if it was error is harmless, the state is not conceding error in this case, because in fact, the judge properly weighs that the, the probative value of this for an elements of a crime, like aggravated criminal sexual abuse that has the purpose of sexual gratification of arousal. And otherwise, without this evidence, a, a woman who is sexually abusing a 14-year-old girl, the jurors might assume that because the larger majority of women are not attracted to other women, that, that the purpose of sexual gratification arousal might not be proved. So therefore it is highly relevant in this case. And it is not at all prejudicial in a sense that it would tend to entice the juror to convict, jurors to convict on a basis that is unrelated to the case, in a sense. So let me just break in. This, this evidence is propensity evidence. Is that right? Um, it's not propensity evidence in the sense of propensity to commit crimes. If that's what, exactly what do you mean by propensity evidence, your honor? Suppose I'm trying to find what your argument would be, if not a harmless error, how is this relevant? How is the state's decision to leave this statement in relevant? Is it, you've almost got to show that there's an intent or other type of reason why this type of propensity evidence would be relevant? Well, in a case where a woman is giving another woman a back rub and then moves underneath her bra and touches her breasts, then the element that has to be the fact that the perpetrator of that offense has a sexual attraction to other, that includes a sexual attraction to other females, like the trial court recognized here, is a matter that makes it more likely that this offense was committed. And that's the standard for relevance under 401. So it is indeed relevant as the trial court found, and that's not an abuse of discretion. Are you saying that shows intent, absence of mistake? Is that your argument? Well, it's actually just direct proof of an element. The inference is that a woman who has an attraction that includes other women, who's giving that woman a back rub and then moves underneath the other woman's bra and touches her breasts, that that would include proof of the purpose of the touching was includes sexual gratification arousal under that element. So the evidence of the defendant admitting her bisexuality is not other conduct, it's not subject to the limitations on other conduct evidence that would require proof, such as a purpose, a non-propensity purpose. So unless it's an other bad act, for example, that would like possession of nude photographs or something that requires a non-propensity purpose. But here, even if that were required, it seems like that's proved because the need to prove the element of purpose of sexual gratification arousal is provided by evidence of the perpetrator having an attraction that includes the victim's gender. And otherwise, without this, because trials are a search for truth, if the jurors didn't have this, they might be assuming, well, she's just simply giving a back rub and then it moves underneath. But they would just assume that she did not have an attraction and included other females. And that would frustrate the search for truth that trials are supposed to be. And the fact that the jurors did get this implicit bias limiting instruction, that just seems like this is a situation where they're not going, there's no risk really here that the jurors are going to harbor some sort of unfair prejudice and decide the case on the basis of some sort of horror of a victim's reveal of their sexual orientation and say that that was something that is going to suggest them want to convict her regardless of the rest of the evidence. So there's no sort of unfair prejudice like that sort of thing. So it seems like the risk of unfair prejudice was very, very low. It was highly probative and therefore there's no way that this could be an abuse of discretion under the very high standard of review that would apply to this sort of issue. So let's talk about probative. What makes this probative that a bisexual woman would be more likely to abuse a minor? Well, not to abuse them in the sense of non-consensual, but this is a, it doesn't have to do with the age of the victim or the fact whether this was consensual or not. Because of the age of the victim, consent is not a defense to this sort of crime. So it just has to do with the purpose of sexual gratification or arousal, not the age of the victim or not whether it was consensual or not. I'm just struggling as to why the state would present, attempt to present the sexuality of the defendant in order to prove them guilty of an offense such as this. Well, it may have just been a preemptive effort just to prevent the defendant's observers from assuming that the victim was of a straight sexual orientation and would not be sexually attracted to females. And that when it starts with a back rub, for example, that the defendant's involvement would not have been for the purpose of sexual gratification or arousal. And because that's not true, that the victim was not in fact straight, she was bisexual, that would just at least prevent the jurors from reaching a misconception of the case and perhaps acquitting her on a false premise. That is, she would not have harbored a purpose of sexual gratification or arousal by engaging in a back rub that somehow moved to an area that it shouldn't have. So for those reasons, the conviction should be affirmed. I'd like to move, unless there are other questions, to the stancing issue. I have one other question. Yes, Your Honor. Justice Panik has argued that the evidence in this case was closely balanced. Does the state agree with that? No, no, no. I'm glad you asked me that. I'm sorry, Your Honor. I should not have moved on without the last part of the harmless error issue. I think the defendant's position is there's no physical evidence that would suggest that the victim was not simply imagining this because of her mental issues. But the defendant's, the father's DNA, one of the co-defendants, the father's DNA was in fact recovered from the victim's underwear. And that just is very conclusive proof on the scale here in terms of whether this is closely balanced or not, because this is not her imagining it. If the father's DNA is on her underwear, that shows that something like this actually happened. It's not her imagination. To be closely balanced, it would have to be kind of a contest of credibility with nothing else weighing on the scale, no sort of physical evidence like DNA evidence that would tend to prove this is a crime. So I think the overwhelming circumstantial evidence also included the way the victim left the hotel room barefoot, running out at two in the morning in the West Market Street in Bloomington, which I don't think anyone would want to do unless they were fleeing something very worse. So that's why circumstantially, I think as well, not just the DNA evidence, but the other circumstances tend to prove that this was a very serious crime that did in fact happen. It's not just simply the victim's imagination. Thanks for asking me that. And in terms of the sentencing issue, because the defendant has to show clear, obvious error, they have a burden of showing that it's not that is clear, obvious that there was not in fact legislative intent to enact a double enhancement here. And the section involved, section A2 of subsection A14, contains a very restrictive enumerated list of the defenses. In a place of juvenile prostitution, I think from the list of offenses, it's like these, these, these, these offenses, but not this one. And then these offenses. And it's just like, it couldn't be more clear just for the statutory language that this sort of aggravating factor is meant to apply in these particular offenses of which this aggravated criminal sexual abuse is a part of. So the defendant can't meet their burden of showing clear, obvious error that this is in fact an improper double enhancement. But even setting aside the propriety of whether this, if it is a double enhancement, whether it is proper or improper, the question is also whether this was in fact a double enhancement at all is also in question here as well. Because I think the defendant likes to cite the charges as referring to a position of trust. But if he looks at it, it shows that the charges are referring to positions of trust, authority, or supervision. And that because the statute of which she was convicted, it can also include positions of authority. That's not a part of the trust or supervision element of the aggravating factor. The jury could have found her guilty on the basis of position of authority, or if it was a position of trust or supervision anyway, it just could have been because it was a case involving accountability. The way the charges also read is that it could involve the father's position of trust, authority, or supervision. And then the defendant has her own position of trust or supervision. And so therefore, because they're different people and the case involved accountability, if the victim's position of trust or supervision, sorry, the defendant's position of trust or supervision could not have been necessarily the basis of the conviction if the juror relied on the father's position of trust, authority, or supervision in order to find her guilty. And then the use at sentencing of her own position of trust or supervision would not constitute a double enhancement because that wouldn't have been the basis for the jury's verdict. So there's a little bit of overlap here in the sense that her own position of trust or supervision was included in the charges, but it wasn't the only part of the charge because it also included a position of authority and also involved accountability, which meant there were two different offenders involved. So the defendant has met her burden of showing a clear, obvious error. She also has the burden of showing closely balanced evidence because of her criminal history and stuff. I don't think that was met, her burden of showing a first-pronged plain error. And also she'd either have to show second-pronged plain error, denial of affair sentencing hearing. And since this was just one aggravating factor, that that's also not met in terms of her burden of showing second-pronged plain error for sentencing errors. So for those reasons, the state would request this court to affirm the conviction and sentence. Thank you, your honors. Thank you. Is there any rebuttal? Briefly, your honor, thank you. On the subject of, if I may go in reverse order, on the subject of Amanda's accountability for the actions of her husband, just to clarify with regard to sentencing, she was in fact found not guilty of the one count that charged a violation based on the behavior of her husband. That's to say the count involving mouth to vagina contact. She was found not guilty of that. So there's no evidence from the jury's verdicts that accountability is what was at play in what they found of her conduct. So that can't excuse the double enhancement here. And then with regard to issue one and whether the evidence was closely balanced, yes, there was an immediate outcry here. However, that was not incompatible with the NN having, you know, delusional paranoia sort of things contributing to her sense of what occurred here. So that was not, that did not alleviate the potential for this to have an impact. And also with regard to the DNA evidence, again, just to clarify the, yes, the father's DNA was on her underwear. She, again, Amanda was found not guilty of the count involving the father, but also it wasn't evidence of semen, for example, we don't even know whether that was just skin cells. So you'd have a father and a teenage daughter, you know, maybe he's doing her laundry, maybe he handled it, you know, the clothing that that's really not probative of sexual abuse. The fact that the father's unspecified DNA is on his daughter's clothing. So the evidence was certainly closely balanced here. The error was not harmless. And we would ask that you reverse and remand for a new trial. Thank you. I see no questions. The court thanks both of you for your arguments. The case is submitted and we will now stand in recess.